IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SABINA BURTON,

                    Plaintiff,

        v.

BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM, CHANCELLOR DENNIS
SHIELDS, JANELLE CROWLEY, DR. STACI
STROBL, DR. MELISSA GORMLEY, DR. ELIZABETH          OPINION and ORDER
THROOP, ROBERT ATWELL, JOHN ROBERT
BEHLING, JOSE DELGADO, DR. TONY EVERS,                    17-cv-36-jdp
MICHAEL GREBE, DR. EVE HALL, MIKE JONES,
TRACEY KLEIN, REGINA MILLNER, JANICE
MUELLER, DREW PETERSEN, CHRIS PETERSON,
JASON PLANTE, RYAN RING, BRYAN STEIL,
S. MARK TYLER, and GERALD WHITEBURN,

                    Defendants.

Plaintiff Sabina Burton was a tenured associate professor of criminal justice at the University of Wisconsin—Platteville. The Board of Regents revoked her tenure and terminated her in 2018. Burton contends that her termination was the culmination of years of unlawful discrimination and retaliation at the hands of her colleagues and UWP administration.

This is the second lawsuit in which Burton has claimed discrimination and retaliation. Her first lawsuit, *Burton v. Bd. of Regents of the Univ. of Wis. Sys.* (*Burton I*), 171 F. Supp. 3d 830 (W.D. Wis. Mar. 18, 2016), concerned events through 2015, when Barton had been disciplined by her department and UWP administration. The court granted summary judgment to defendants, and that decision was affirmed on appeal. This suit picks up in spring 2016, addressing the events that culminate in Burton's dismissal.

The court has already dismissed some of Burton's claims in this case. Dkt. 66. Defendants move for summary judgment on those that remain, primarily claims of discrimination and retaliation brought under Title VII of the Civil Rights Act and the First Amendment. Dkt. 90. Burton contends that her discipline and termination are the result of her opposition to corruption and unlawful employment practices at UWP. But the evidence shows that Burton was disciplined and terminated because she engaged in unprofessional and abusive conduct toward her colleagues and UWP administrators, while ignoring all directives to find less disruptive ways of expressing her grievances. Neither the First Amendment nor Title VII immunizes Burton from the consequences of her grossly unprofessional conduct, so the court will grant defendants' motion for summary judgment.

## UNDISPUTED FACTS

The court begins with a few words about Burton's summary judgment submissions. She began this case represented by counsel, but she is now proceeding pro se. Ordinarily, the court views the submissions of unrepresented parties generously, although all parties are expected to follow the court's procedures on summary judgment which are set out in the Standard Attachments for Civil Cases. Dkt. 14. Burton is familiar with the court's summary judgment procedures because she cites them extensively in her responses to defendants' proposed findings of fact. *See, e.g.*, Dkt. 102, ¶¶ 12, 14, 20. Burton is a sophisticated, highly educated litigant, more capable than most pro se parties of assembling her evidence and presenting it to the court as required. She has failed to do so.

In opposition to defendants' motion for summary judgment, Burton submitted 707 proposed findings of fact. Dkt. 103. Most of Burton's proposed findings contain no citation to

record evidence. Some that refer to evidence cite lengthy audio or video recordings without providing timestamp or other indication of the relevant portions. See *id.*, ¶¶ 246 (84-minute audio recording), 392 (53-minute audio recording), 395 (56-minute audio recording). Burton's proposed facts are often merely argumentative. *See, e.g., id*. ¶ 263 (proposing "That's just ridiculous" as a finding of fact). Some are naked legal conclusions. *See, e.g., id.* ¶¶ 103, 127, 634 ("This was a protected activity."). Burton's deficiencies made the task of verifying her version of the facts nearly impossible. Accordingly, the court will consider only the proposed findings of fact that Burton expressly discusses in her opposition brief.

The following facts are undisputed, except where noted.

In 2012, Burton reported an incident of alleged sexual harassment of a student to defendant Elizabeth Throop, then-dean of UWP's College of Liberal Arts and Education. According to Burton, in the months following this report, UWP faculty and staff engaged in conduct that Burton perceived as retaliatory, such as making veiled criticisms of the way that she had handled the student's complaint and withdrawing support from a cybersecurity program that she was developing. These events ultimately led Burton to file *Burton I* in February 2014, alleging discrimination and retaliation by the Board of Regents, Throop, and two other UWP employees. I dismissed that case at summary judgment in March 2016 after concluding that Burton had adduced no evidence to support her claims. 171 F. Supp. 3d 830. The Court of Appeals for the Seventh Circuit affirmed this decision on appeal. *See Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690 (7th Cir. 2017).

Burton filed this lawsuit in January 2017. The events relevant to this case begin in 2016, shortly after the dismissal of *Burton I*. Burton has amended her complaint several times to address subsequent events. In June 2018, the Board of Regents voted to revoke Burton's

3

tenure and terminate her employment, events addressed in Burton's fourth amended complaint, Dkt. 51.

## A.  Burton reports colleagues for bullying behavior

On May 6, 2016, Burton emailed defendant Janelle Crowley, UWP's human resources director, to complain about what she perceived as retaliatory conduct by Mike Dalecki, the former chair of the criminal justice department. (Dalecki and Burton had a contentious relationship. *See* 171 F. Supp. 3d at 836–37.) In the email, Burton alleged that Dalecki kept coming into the department office and grimacing at her. She also alleged that the previous Monday, Dalecki "pointed his fingers at [her] like a gun and his thumb fell as though he pulled the trigger." Dkt. 92-24, at 1.

After speaking with Burton, Crowley interviewed Dalecki and several individuals in the criminal justice department. Dalecki denied ever pointing a finger at Burton, although he conceded that he had stopped by the criminal justice department a few times. Other individuals in the department indicated that they had rarely seen Dalecki there. In a June 26 memorandum addressed to Dean Throop, Crowley wrote that "at this time, Dr. Burton's inferences [of intentional intimidation by Dalecki] are unfounded." Dkt. 94-25, at 1. Burton disagrees with Crowley's conclusion and calls her investigation a "sham." Dkt. 117, ¶ 160.

Burton also complained about Deborah Rice, a senior lecturer in the criminal justice department. According to Burton, Rice spread false rumors in 2014 and 2015 that Burton was mentally ill and that Burton was biased against East Germans. *Id.* ¶ 67.  Neither side proposes any facts regarding when and to whom Burton reported these two comments, but Burton alleged in her complaint that she reported them to Crowley and Staci Strobl, the chair of the criminal justice department, on April 26, 2016, Dkt. 51, ¶¶ 154–55, 159–60, and that UWP

Chancellor Dennis Shields learned of these comments on June 3, 2016. *Id.* ¶¶ 164–65. These reports are the factual predicates for Burton's claims of discrimination and retaliation under Title VII (based on Burton's German national origin) and the Rehabilitation Act (based on the false perception that Burton had a mental illness).

**B.  Burton's 2016 letter of direction**

In May 2016, Chancellor Shields was  provided with several emails that he believed exemplified an ongoing pattern of unprofessional conduct. For example, in one email dated April 26, 2016, Burton told Strobl that she would not collaborate on a grant project with Rice. About Rice, Burton wrote:

> She is a very mean person who has defamed me in public and stated among other nasty things and in front of at least one student that I had a mental illness. Rice has refused to apologize . . . . Rice is close to Dalecki and was clearly against you becoming chair. She shouldn't even be working for this department anymore as defamation is a crime in WI.
>
> I will take this to the public soon and/or file a lawsuit for defamation. I am considering a police report as well.
>
> I am sorry but I don't want to have my name on a report with such a nasty person.

Dkt. 91-2, at 1. In Shields's view, this email constituted an intentional effort by Burton to sow dissention within the department by pitting Strobl and Rice against each other. Burton denies that the email was in any way unprofessional. Dkt. 118, ¶ 21. In another email sent a few weeks later, Burton told Strobl that she was "dealing with veiled death threats," presumably a reference to the finger-pointing incident with Dalecki. Dkt. 91-5, at 4.

In other emails, Burton expressed dissatisfaction with the way UWP was handling grievances that she had filed in connection with the issues raised in *Burton I*. She accused UWP's grievance committee of violating its own rules by failing to schedule hearings on

5

grievances that Burton had filed against Rice and Throop, asserting that Rice "deserve[d] to be disciplined," and stating, "Dean Throop has a lot to hide and I have a lot to expose. Who are you protecting?" Dkt. 91-3, at 1. In a separate email to the committee's chairperson, Burton questioned whether he was complicit in a cover-up and threatened to sue him. *See* Dkt. 91-5, at 2 ("Are you protecting someone? Who? Are you violating my rights because certain people have dirt on you or because they threatened your employment?").

In another email sent to members of the Board of Regents, Burton accused various UWP officials of violating "[p]olicy and law" "with reckless abandon in a concerted and discriminatory effort to . . . cover up the truth and to set me up for termination on trumped up charges." Dkt. 91-4, at 1. She said that the way that UWP handled grievances was "indicative of a totalitarian society like North Korea," and called on the Board of Regents to institute reforms and impose discipline on various individuals. *Id.* at 4. Shields viewed Burton's accusations as false and inflammatory and her choice to air workplace grievances in this manner as inappropriate and unhelpful.

In Shields's assessment, Burton had been bullying her colleagues and impeding the functioning of the criminal justice department. Although he didn't fault Burton for having concerns, complaints, or grievances, Burton's manner of expressing those concerns—making accusations of ethical violations and personal attacks—caused acrimony and dysfunction. So on June 3, 2016, Shields issued Burton a "letter of direction" compiling a list of Burton's concerning statements and ordering her to "cease using University resources to harass,

intimidate or threaten [her] co-workers and supervisors."[1] Dkt. 91-6, at 2. He also instructed Burton to direct all future informal complaints about colleagues or university administration to Crowley in the HR department at UWP. Burton denies that her emails were harassing, intimidating, or threatening and says that they constituted protected activity for which she could not legally be disciplined. Dkt. 117, ¶¶ 186, 187.

## C.  UWP investigates and dismisses hostile-work-environment complaint against Burton

In August 2016, Rice complained to HR that Burton was "smearing [the department's] reputation and creating a hostile work environment" by, among other things, repeatedly filing grievances against Rice and publicly impugning her and other members of the criminal justice department in YouTube videos and Twitter posts. Dkt. 91-7, at 1. Shields decided to hire a private consulting firm to investigate the allegations. The assigned investigator, Dale Burke, attempted to schedule an interview with Burton. Burton was resistant; after only a brief email back-and-forth with Burke, Burton accused him and Shields of harassment. *See* Dkt. 92-5. Crowley sent Burton a letter ordering her to meet with Burke on September 6, at which point Burton agreed to sit for an interview.

On September 2, Burton filed a harassment complaint against Rice asserting many grievances. *See* Dkt. 92-11, at 1–3 (complaining that Rice had, among other things: called herself a "co-leader" of a faculty-led study abroad trip when she was not in fact a co-leader; falsely reported that Burton had cancelled a class; showed hostility instead of welcoming Burton back when she returned from a FMLA leave; and generally demonstrated "great

---

[1] This was Burton's second letter of direction. Burton received her first letter of direction from then-Dean Throop in October of 2014. That letter of direction was one of the adverse employment actions litigated in *Burton I* and is not directly at issue here.

disrespect" for Burton despite "occup[ying] a lower position in the CJ department"). Rather than sending the complaint to Crowley, she sent it to a wide-ranging list of individuals, including the Board of Regents, the Equal Employment Opportunity Commission, a state senator, and Rice herself. Dkt. 108-1. Shields decided to have Burke investigate Burton's allegations against Rice in conjunction with his investigations of Rice's allegations against Burton.

On September 6, shortly before Burton's interview with Burke was scheduled, Burton's husband Roger canceled it on Burton's behalf, citing Burton's ulcer condition. In an email to Crowley, Roger noted that Burton "often gets flare ups when she is stressed," and that it "did not help that you mandated a meeting time that was inconvenient for her. I ask that next time you please allow her to pick a meeting time that fits better with her schedule as that will help alleviate the stress." Dkt. 92-8, at 1.

The next day, Crowley emailed Burton to propose times for a rescheduled meeting with Burke. In response, Burton stated her belief that she was "the victim of a new round of retaliation" and accused Crowley of "attacking the victim of harassment." Dkt. 92-9, at 1. She said that due to the stress Crowley and others had caused her, her doctor recommended delaying the investigation until her health had stabilized. Burton submitted a doctor's note requesting a four-week postponement until October 9. *See* Dkt. 92-10. Burke agreed to this accommodation and waited until October 10 to interview Burton.

In late November, Shields received Burke's final reports on his investigations into Burton and Rice's allegations about each other. *See* Dkt. 109-6 (Burton complaint) and Dkt. 109-7 (Rice complaint). Neither report is particularly illuminating: both Rice and Burton generally disputed the other's version of events and described why they believed their

8

statements and conduct had been reasonable.[2] After reviewing those reports, Shields decided to dismiss both complaints. He sent both Rice and Burton letters indicating that he didn't think the complaints warranted further investigation or disciplinary action given that they seemed to be a function of "personal misunderstanding, miscommunication, and personal animosity." Dkt. 109-6, at 1 and Dkt. 109-7, at 1.

## D. Burton's continued accusations against UWP personnel

As the Burke investigation was going on, Crowley continued to receive complaints about Burton, who continued to confront individuals at UWP for perceived misconduct, incompetence, or complicity in the retaliation that Burton believed she was experiencing. Dkt. 92, ¶¶ 26–29.

On November 6, Burton emailed defendant Melissa Gormley (the interim dean of the College of Liberal Arts and Education), Strobl, and a local reporter to accuse Strobl of cronyism, sexism, bias, and being unqualified to be chair of the criminal justice department. *See* Dkt. 91-12, at 42–45. She ended the email by asserting that Strobl is "too weak, and too quick to compromise her values, to lead this department where it needs to go. She advocates for women's rights in Bahrain. She should not turn a blind eye to due process violations in the United States." *Id.* at 46.

---

[2] Burton says that "the investigation report in the record is clearly not Mr. Burke's." Dkt. 118, ¶ 69. But the only evidence she cites for this proposition is an email exchange between Burton, Crowley, and Burke in which Burke attributes a purported inaccuracy in his report (about the precise number of grievances Burton had filed against Rice) to the fact that his "final draft was edited by a third person prior to delivery to the University." Dkt. 98-23. Burton does not explain how a single editing error introduced by a third person renders the report "clearly not Mr. Burke's."

On November 14, Burton emailed a fellow UWP criminal justice professor, Amy Nemmetz, to confront her about a statement that Throop had made a year earlier in her deposition for *Burton I*. Burton wrote:

> Throop stated that you have complain[ed] about me to her during her deanship . . . I am pretty shocked by that revelation. Why did you do that? I took great heat from some of the department members for hiring you. You were marked down by two faculty members senior to you stating that you were minimally qualified for the position. Both suggested you should get a lower pay. I fought for you, even got HR involved. I have emails to prove that. Now I learn that you complain[] behind my back. . . . Why would you do that? What did I do to you? I guess you just had to join the retaliation train in hopes of getting accolades from the administration. I hope it has paid off. I guess it has.

Dkt. 92-13, at 1.

On November 23, Patrick Solar, another UWP criminal justice professor, collected evidence of several incidents involving Burton for an HR complaint about Burton. Solar alleged that Burton was engaging in an escalating pattern of hostile behavior that was making the workplace intolerable. *See* Dkt. 92-16.[3] Among other things, he alleged that Burton was using her university email address to send intimidating, threatening, and harassing messages. In an appendix to his complaint, he included a November 3 email, which Burton had sent to former Madison police chief David Couper, who was an instructor in the criminal justice department:

> David,
>
> Why do you keep referring to yourself as a faculty member? Do you have a Ph.D. that I don't know of? Have you been hired through a faculty search & screen that I don't know of? You are

---

[3] Burton contends that Solar's complaint is inadmissible hearsay and should be excluded. Dkt. 118, ¶ 63. Defendants offer the complaint itself not as evidence that its allegations were true, but rather to explain their subsequent actions (i.e., seeking Burton's termination). *See Breland*, 358 F.3d at 792. Burton admits that she is responsible for the attachments. Dkt. 118 ¶¶ 65, 66.

not even an academic staff member. You are an adjunct lecturer, an at will employee with no voting rights in the department. Why do you feel the need to misrepresent your status to students and colleagues? I don't get it.

I appreciate your expertise and your input in matters but I don't appreciate you presenting yourself as my equal at this university. This ongoing misrepresentation is part of the problem.

. . .

Sabina

Dkt. 92-16, at 5.

Solar's complaint also alleged that Burton had secretly recorded conversations and meetings, and that those recordings were posted online. Unbeknownst to Crowley and other HR officials, Burton had been recording department meetings. And Burton's husband Roger had been uploading recordings and transcripts to his website, UniversityCorrpution.com, which he used to publicly chronicle Burton's conflicts with UWP colleagues and administrators. When Solar discovered the site, he emailed Burton at her university email address to ask that his name be removed from it. Roger responded on Burton's behalf at length, included the following:

> The repercussion [for your part in the retaliation Burton has experienced] is that your name is in a database of evidence that I have spent forty hours a week producing over the past four years. I assure you I am very good at this and the evidence is quite strong. I had to quit volunteering as a firefighter for the Platteville FD. I had to curtail my efforts to provide income for my family through my real estate job. I have given up my salary for four years so I could produce this evidence. Why? Because people like you can't resist dog-piling on my wife. I used to fly fighter jets in the USMC to defend your freedoms, and you dare participate in the denial of my wife's right to due process? I risked my life in Desert Storm to protect people I don't even know and to protect your interests. I will gladly risk my reputation, my money, my time, my effort, even my life to defend my wife against the kind of retaliation she has suffered. . . . Now you ask me to remove your name from my very

11

> complete, very detailed and very accurate database? What makes
> you think I would do that Pat, the "Spirit of Collegiality?"

*Id.* at 7.

Solar also alleged that Burton had been drawing students into her conflicts with UWP. He included with his complaint a copy of a post Burton had made on Facebook, which had inspired a student to email UWP officials to express that she was "very frustrated, disappointed and ashamed to have been attending this institution, due to the t[urm]oil in the Criminal Justice Department" and the fact that "the parties responsible for the discrimination against Dr. Burton are not addressing this issue." *Id.* at 9.

### E.  UWP initiates a Chapter 4 complaint

In November, 2016, Gormley and Throop (who was then serving as the interim provost) began drafting a complaint against Burton under Chapter 4 of the administrative code. A Chapter 4 complaint is the mechanism for initiating dismissal proceedings for tenured faculty members in the University of Wisconsin System. *See* Wis. Admin. Code § UWS 4.02. Gormley and Throop submitted this complaint to Chancellor Shields on December 16, 2016. The complaint alleged that Burton's "failure to engage with colleagues in a collegial and productive manner, her unlawful disclosure of confidential information, her refusal to follow directives from her superiors, and her engagement of students in her personal affairs render her unfit to continue as a tenured faculty member." Dkt. 91-11, at 1. It provided details about sensitive materials Roger had posted on UniversityCorruption.com, including recordings and transcripts of departmental and university meetings that featured performance evaluations for junior faculty. It also chronicled ways in which Burton was alleged to have violated the directives provided to her in letters of direction by harassing and intimidating colleagues and supervisors and involving students in her personal disputes.

In January 2017, Shields hired an investigator to investigate the complaint under Wis. Admin. Code § UWS 4.02(1). In the meantime, he suspended Burton from teaching, banned her from campus, and directed the university provost to deny Burton's request to teach an "overload" course that she had been slated to teach at the University of Wisconsin-Milwaukee for the spring 2018 semester.[4] In March 2017, the investigator turned in 73 pages of findings and exhibits corroborating the allegations in the Chapter 4 complaint. *See* Dkt. 91-12. Burton says that the investigation was a "sham," that the report in the record is "an altered version," and that its contents are false. Dkt. 118, ¶ 90 (citing Dkt. 104, ¶¶ 432–75). But Burton cites only her own declaration as evidence against the investigator's findings, and her assertions are speculative. So the court will not credit Burton's attempt to dispute the investigator's findings. Shields provided the investigator's report to Burton and offered to meet with her for an informal discussion before making a decision about whether to issue charges. Burton declined to meet with Shields.

On March 30, 2017, Shields provided Burton with a statement of charges, including:

- publicly disclosing confidential personal information of her colleagues;

- engaging in disrespectful, harassing, and intimidating behavior toward her colleagues in an attempt to undermine them professionally and damage their reputations and careers;

- violating the 2014 letter of direction by involving students in her personal disputes by making statements on social media and directly involving students in her employment disputes;

---

[4] Under Wis. Admin Code § UWS 4.09, the chancellor may relieve a faculty member of his or her duties with pay while the termination investigation is pending if he "finds that substantial harm to the institution may result if the faculty member is continued her his/her position."

13

- misrepresenting facts about her employment disputes when speaking with students;

- discussing her personnel concerns during class; and

- engaging a graduate student to secretly record a colleague's conversation and then post it online.

Dkt. 91-14, at 2–5. Shields found that the charges were supported by evidence and that there was just cause to dismiss Burton from her tenured faculty position. *Id.* at 5.

## F.  Administrative hearing

Burton pursued her right to a hearing before a UWP faculty committee under Wis. Admin. Code § 4.04. Burton says the hearing proceedings were riddled with due process violations. But I dismissed Burton's due-process claims in this case because she has abundant procedural protections under state law, which provided notice of the charges, an opportunity to respond, and allows her to challenge her dismissal in state court. Dkt. 66, at 19–21. Accordingly, I need not recount the administrative proceedings in detail. For purposes of the claims that remain in this case, the following are the relevant facts.

Burton's administrative hearing was scheduled to take place starting on May 25, 2017. On May 21, Burton requested that the hearings be limited to half-days and that there be at least a one-week lapse between hearing days to accommodate her ulcer condition. The chairperson for the hearing appeal panel denied this request, noting that it was made "a mere four days before the commencement of the hearing" and that "no medical information ha[d] been submitted to substantiate the request." Dkt. 91-16, at 1. On May 25, minutes before the hearing was supposed to begin, Roger Burton notified Shields and the assembled panel members that Burton could not attend the hearing due to her medical condition. The UW System's attorney urged the hearing panel to proceed with the hearing as scheduled, and it did.

14

Several days after the hearing, on June 1, Burton's doctor submitted a letter discussing Burton's history of stress-related ulcers and requesting that Burton be retroactively "excused from sessions on 5/25/17 and 5/26/17 as she was physically ill from the pain of the worsening ulcerations." Dkt. 91-17.

The hearing continued for two additional days, with three-hour follow-up sessions taking place on September 19 and November 30, 2017. Burton was present for both sessions. After the final session, the faculty hearing committee voted unanimously to terminate Burton's tenure. After Burton declined a final offer from Shields to meet and discuss the hearing committee's findings informally, Shields wrote to the Board of Regents recommending termination of Burton's tenure. After holding oral arguments in an open session, the Board of Regents issued a decision revoking Burton's tenure and terminating her on June 8, 2018.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Burton is proceeding on (1) disability and national-origin discrimination claims under the Rehabilitation Act and Title VII, respectively, as well as claims for both types of discrimination under the Equal Protection Clause; (2) retaliation under Title VII and the Rehabilitation Act; (3) failure-to-accommodate claims under the Rehabilitation Act; and (4) retaliation under the First Amendment.[5] Defendants move for summary judgment on all of

---

[5] In her opposition to defendants' summary judgment motion, Burton attempts to assert a claim for retaliation under Wisconsin's whistleblower law, Wis. Stat. § 230.83, as well as a Title VII hostile-work-environment claim. *See* Dkt. 101, at 31–33. But Burton didn't plead a claim under the whistleblower statute in her fourth amended complaint, and I dismissed Burton's hostile-work-environment claim in my decision on defendants' motion to dismiss that complaint, Dkt. 21, at 13, so those claims are not in the case.

these claims. Defendants are entitled to summary judgment on a claim if they show that Burton lacks evidence to support an essential element on which she bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, Burton "must set forth specific facts showing that there is a genuine issue for trial." *Id.* She may not simply rely on the allegations in her pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [her] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996).

As a preliminary matter, defendants contend that most of Burton's claims are barred by the doctrine of claim preclusion, which bars litigants from asserting claims they asserted or could have asserted in a prior action. Burton sought judicial review of the Board of Regents' decision to revoke her tenure in the circuit court for Grant County, Wisconsin as provided under Wis. Stat. § 227.53(1)(a). *See Burton v. Bd. of Regents*, Case No. 2018CV218 (Grant Cty. Cir. Ct. filed July 6, 2018). The state court upheld the decision of the Board of Regents on November 12, 2019.[6] Defendants argue that this judgment has preclusive effect because Burton had an opportunity to litigate any statutory or constitutional claim related to her termination in the administrative proceedings and the state-court case that followed.

Defendants have a good claim preclusion argument, but the court will decide the federal statutory claims on the merits. The court will address claim preclusion in the context of Burton's First Amendment retaliation claim.

---

[6] Burton's appeal of that decision is pending. *See* Case No. 19AP2276 (Wis. Ct. App. filed Dec. 2, 2019).

16

## A. Discrimination claims

Burton alleges that she suffered two types of discrimination in this case: (1) disability discrimination in violation of the Rehabilitation Act and the Equal Protection Clause; and (2) national-origin discrimination in violation of Title VII and the Equal Protection Clause.

### 1. Disability discrimination

The Rehabilitation Act prohibits any program receiving federal financial assistance (including public universities, such as UWP) from discriminating "solely by reason of [an individual's] disability." 29 U.S.C. § 794(a). To survive summary judgment on her Rehabilitation Act discrimination claims, Burton must adduce evidence from which a reasonable jury could conclude that her disability (her ulcer condition) or her perceived disability (mental illness) was the but-for cause of adverse employment actions she suffered. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Regarding Burton's ulcer condition, I previously understood Burton's fourth amended complaint as alleging that the Board of Regents took adverse employment actions against her because of that condition. But at summary judgment, Burton clarifies that her theory of discrimination based on her ulcer disorder is not that she was "dismissed solely because of her medical condition," but rather that defendants "denied her request for medical accommodations" and "conducted an appeal hearing while they knew she was attending to her medical emergency and was unable to attend the hearing." Dkt. 101, at 35. These are failure-to-accommodate claims, which are analyzed under a different legal test than claims alleging discriminatory adverse actions. *See Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013) (discussing the elements of a failure-to-accommodate claim). I discuss those claims in a separate section below.

Because Burton doesn't assert that defendants intentionally discriminated against her because of her ulcer condition, I will grant defendants' motion for summary judgment on that aspect of her Rehabilitation Act and equal protection claims.

As for the claims about perceived mental illness, the only proposed findings of fact that Burton provides that potentially relate to this claim are that: (1) Rice spread rumors in 2014 and 2015 that Burton was mentally ill and (2) Throop referred to Burton as "emotionally labile" in 2013. *See* Dkt. 117, ¶¶ 65, 67. Burton speculates that "the rumors spread by Rice were believed" by Throop and others, causing them to "act[] on the perception that Burton was somehow mentally ill or 'emotionally labile.'" Dkt. 101, at 33. But "speculation is not evidence." *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016). The record contains nothing from which a jury could infer that anyone heard Rice's rumor, believed it, and acted based on it in disciplining, terminating, or taking any other adverse action against Burton. So defendants are entitled to summary judgment on these Rehabilitation Act and equal protection claims as well.

### 2. National-origin discrimination

To survive summary judgment on her claims for national-origin discrimination under Title VII and the Equal Protection Clause, Burton needs to adduce evidence from which a reasonable jury could find that defendants took materially adverse actions against her because of her German national origin. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). Here, the only evidence in the record that is even tangentially related to Burton's German national origin is from Burke's report of his investigation into Burton and Rice's dueling HR complaints. In that report, Burke gave the following account of his interview with Rice, who was describing her impressions of Burton during an academic trip to Germany that she and Burton had taken together in 2013:

> Rice pointed to one tour on this trip and described Burton's
> seemingly detached demeanor during a tour of a Nazi
> concentration camp. Rice found this strangely odd as Burton has
> told others that her father was a pilot during the Nazi regime, yet
> she displayed no outward emotion during the visit. Rice also
> believed that Burton had made a statement at some point during
> [*Burton I*] in which Burton alluded to her Jewish heritage. Rice
> found this inconsistent with the supposed relationship between
> Burton's father and the Nazis and wondered what if anything that
> Burton said was factual.

Dkt. 109-7, at 12. Burton's theory is that Shields read this report, dismissed Rice and Burton's

cross-complaints, but then "used the Rice complaint as a basis for the charges" that ultimately

led to her dismissal. Dkt. 101, at 34.

Although Rice's HR complaint and Shields's Chapter 4 dismissal charges both generally

concerned allegations that Burton was creating a hostile work environment, there is no evidence

that the Chapter 4 charges were based on Rice's HR complaint. Indeed, the charges were based

on an entirely different set of incidents; Rice's name is nowhere mentioned. *See* Dkt. 91-14.

But even if Shields did base the charges on information he learned from Burke's report, no

reasonable jury would conclude that, because the report contained a fleeting reference to

Burton's father and the Nazis, Shields held anti-German bias and resolved to terminate Burton

on that basis. Defendants are entitled to summary judgment on Burton's claims for national-

origin discrimination.

## B.  Statutory retaliation claims

Both the Rehabilitation Act and Title VII prohibit employers from retaliating against

employees for opposing practices made unlawful by those statutes. *See* 29 U.S.C. § 794(d)

(providing that claims under the Rehabilitation Act incorporate the same substantive standards

as the Americans with Disabilities Act, which has a retaliation provision analogous to Title

VII's, *see* 42 U.S.C. § 12203(a)); 42 U.S.C. § 2000e-3(a) (Title VII retaliation provision). To

survive summary judgment on her retaliation claims under these statutes, Burton needs evidence that her statutorily protected activities were the but-for cause of the adverse actions she suffered. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020).

### 1. Retaliation under the Rehabilitation Act

Burton contends that there are "direct causal links between many protected activities and adverse actions," Dkt. 101, at 37, but she discusses only one example in her brief: her request for a postponement of the May 2017 administrative hearing (the alleged protected activity), which caused the committee to decide to proceed with the hearing in her absence (the alleged adverse action).[7] Once again, Burton attempts to shoehorn what is at bottom a failure-to-accommodate claim into an ill-fitting legal framework. Burton hasn't shown that her request for accommodation actually caused the panel to do anything, materially adverse or otherwise. Had Burton *not* asked for a postponement of the May 25 hearing, the panel would have held the hearing as scheduled. This shows that the panel didn't hold the hearing without Burton because she asked for an accommodation. They held it without her because she didn't show up. Defendants are entitled to summary judgment on Burton's Rehabilitation Act retaliation claims.

---

[7] Burton also says that her 80-page declaration is "replete with other examples of protected activities causally connected to numerous adverse actions adversely and circumstantially." Dkt. 101, at 37. But she doesn't cite these examples and I will not scour the record for them. *See* Dkt. 81, Preliminary Pretrial Packet in cases assigned to District Judge James D. Peterson, at 5 ("The court will not search the record for evidence. Supporting evidence should be clearly cited and submitted . . . ."); *see also Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017) (court need only consider the cited materials and need not scour the record for evidence that is potentially relevant to the summary judgment motion).

### 2.  Retaliation under Title VII

Burton doesn't provide evidence that activities protected by Title VII prompted any adverse employment actions either. Her brief simply provides a list of activities she engaged in followed by a list of adverse actions that she says resulted from these activities, with no explanation why she believes they are causally connected. *See* Dkt. 101, at 9–10. That's not enough to raise a genuine issue. *See King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017) (summary judgment is appropriate where plaintiff provides only conclusory assertions of causation and makes no attempt to connect adverse employment actions with protected activity). Burton appears to assume that because she engaged in protected activity and then experienced adverse employment actions later on, there must have been a causal connection between the two. But absent "corroborating evidence that supports an inference of causation," speculation based on timing "does not support a reasonable inference of retaliation." *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 681 (7th Cir. 2015) (citations and quotation marks omitted).

Based on my own review of the facts, only one of the alleged protected activities Burton identifies has any clear causal relationship with an adverse action that Burton suffered. Specifically, Burton identifies "providing information to her husband that he published on universitycorruption.com" as protected activity under Title VII. Dkt. 101, at 9. There's no dispute that material on the website was a factor in Burton's termination and tenure revocation. The question is whether posting this information on the website qualified as "opposing a practice made unlawful by Title VII." *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (citing 42 U.S.C. § 2003e-3(a)).

Burton hasn't submitted the relevant pages of the website to the record, so the court can't fully evaluate her assertion that it includes content within the scope of Title VII's anti-

retaliation provision. The only evidence about the website in the record comes from defendants. *See* Dkt. 91-12, at 54–64. Judging from the printouts they provide, no reasonable jury could conclude that the material on UniversityCorruption.com was opposition to practices prohibited by Title VII. The website contains conclusory statements that it is about discrimination, sexual harassment, and sexual violence at UWP. But the actual content concerns the details Burton's personal conflicts with colleagues and administrators. General complaints about the workplace don't constitute protected activity, *Huang v. Continental Cas. Co.*, 754 F.3d 447, 451 (7th Cir. 2014), and couching those complaints in antidiscrimination language doesn't render them protected by Title VII. *Cf. Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient" for purposes of Title VII's anti-retaliation provision).

The evidence submitted by defendants shows that the Burtons' website included recordings and transcripts of department meetings, including meetings at which the faculty reviewed the performance of criminal justice department members. Burton says that she should not be disciplined because making and disclosing these recordings and transcripts was not illegal. But that misses the point. The question isn't whether Burton's speech was unlawful; the question is whether she has adduced evidence that defendants retaliated against her for opposing sex discrimination. The evidence shows that defendants were displeased with Burton, not for opposing sex discrimination, but for disclosing personal information that the reviewers—and the subject of the review—would expect to remain confidential. Burton's disclosure of recordings and transcripts of these personnel review meetings was a gross violation of common-sense norms, which has the potential to cause embarrassment and lasting damage

to department morale. The department and the university was entitled to discipline or terminate her for it. Burton makes no showing that the disclosure of these reviews constituted opposing a practice prohibited by Title VII.

Burton has adduced no evidence from which a reasonable jury could find that defendants retaliated against her for Title VII-protected activity. Defendants are entitled to summary judgment on Burton's Title VII retaliation claims.

## C. Failure-to-accommodate claim

Based on her briefing at the motion to dismiss stage, it appeared that Burton was asserting two claims under a failure-to-accommodate theory: (1) defendants violated the Rehabilitation Act by moving forward with the Burke investigation in September 2016 even though Burton was unable to participate because of her ulcer flare-up; and (2) defendants violated the Rehabilitation Act by refusing to cancel the May 25, 2017 administrative hearing after Burton was unable to attend due to another ulcer flare-up. At summary judgment, Burton says that she "has not alleged that defendants violated [the Rehabilitation Act] by refusing to accommodate her illness during the Burke investigation," and that this was actually an instance where the university acted reasonably by allowing her to delay interviewing with Burke by one month. Dkt. 101, at 36. So I will consider that claim abandoned and I will limit my analysis to the administrative-hearing claim.

To survive summary judgment on her failure-to-accommodate claim, Burton must provide sufficient evidence for a jury to find that (1) she was a qualified individual with a disability; (2) defendants were aware of the disability; and (3) defendants failed to reasonably accommodate that disability. *Brumfield*, 735 F.3d at 631. Burton says that defendants were statutorily obligated to comply with her demand on May 21 that they conducted the hearing

in half-day increments spaced at least a week apart, and her husband's demand on May 25 that they cancel the hearing entirely. But the Rehabilitation Act "does not entitle a disabled employee to the accommodation of [her] choice. Rather, the law entitles [her] to a *reasonable* accommodation in view of [her] limitations and [her] employer's needs." *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015) (emphasis in original).

Under these circumstances, no reasonable jury could find that the accommodations that Burton demanded were reasonable. Considerable planning went into preparing for Burton's hearing; panel members and witnesses had to clear their schedules, administrative staff had to arrange for a court reporter and a conference room, and the parties had to prepare their respective cases. Dkt. 118, ¶ 111. It wasn't reasonable for Burton to demand substantial scheduling changes only four days before the hearing and without a supporting doctor's note. It was even less reasonable for Burton's husband to demand that the hearing be canceled entirely only minutes before it was scheduled to start, after everyone had assembled, and still without a corroborating doctor's note. What's more, Burton made clear that her ulcer condition was triggered by stress, so there was little reason for the panel to believe that postponing the administrative hearing until Burton's health improved was a workable accommodation. After all, the hearing was always going to be stressful.

Burton argues that the Rehabilitation Act requires employers to provide "*some* reasonable accommodation," even if it's not necessarily the accommodation of the employee's choice. Dkt. 101, at 36 (citing *Gratzl v. Office of Chief Judges of 12th,18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 681 (7th Cir. 2010)) (emphasis Burton's). But defendants met that obligation in this case. The May 25 hearing session was recorded and transcribed so that Burton was able to review it after the fact, and the panel held two subsequent hearing sessions that

Burton was able to attend in person. Burton doesn't explain why this wasn't adequate. Based on these facts, no reasonable jury could conclude that defendants failed to accommodate Burton in violation of the Rehabilitation Act.

## D. First Amendment retaliation

That leaves Burton's First Amendment retaliation claims. As a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Nieves v. Bartlett*, --- U.S. ----, 139 S. Ct. 1715, 1722 (2019). To prevail on her First Amendment retaliation claim, Burton must show that "the speech or activity was constitutionally protected, a deprivation occurred to deter the protected speech or activity, and the speech or activity was at least a motivating factor in the decision to take retaliatory action." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If Burton makes those showings, then the burden shifts to defendants to rebut the claim, by showing that they would have taken the adverse action would have occurred regardless of the protected activity. *Id.*

### 1. Claim preclusion

The court returns here to the question of preclusion. Defendants contend that all Burton's claims are precluded by her state-court challenge to the decision by the Board of Regents to uphold her termination. The court did not invoke the doctrine of claim preclusion with respect to Burton's federal statutory claims. Defendants make a credible argument that Burton could have raised her federal statutory claims in her state-court case, but those causes of action are not typically heard in state court. So, without actually deciding the preclusion issue, it makes sense for this court to address the federal statutory claims on the merits, to ensure that Burton has a full and fair opportunity to present those claims. *See Krison v. Nehls*, 767 F2d 344, 348 (7th Cir. 1985).

But that consideration doesn't apply to Burton's First Amendment retaliation claim, which is inextricably linked to the merits of her state-court case. She could have—and did—raise First Amendment and academic freedom arguments to the state court. The state court rejected those arguments in an oral decision on November 1, 2019, and it entered an order in favor of the Board of Regents on November 4, 2019. *See* Dkt. 95-3 and 95-4. Burton has appealed the decision, and she has pressed her academic freedom argument in the Wisconsin Court of Appeals. *See* Brief of Appellant in *Burton v. Board of Regents*, Appeal No. 2019AP2276 (Wis. Ct. App), *available at* wscaa.wicourts.gov.

Wisconsin law determines whether Burton's state-court case has preclusive effect here. *See Wilhelm v. Cty. of Milwaukee*, 325 F.3d 843, 846 (7th Cir. 2003); 28 U.S.C. § 1738. In Wisconsin, as in most jurisdictions, claim preclusion bars "all subsequent actions between the same parties as to all matters which were litigated or which might have been litigated in the former proceedings." *Teske v. Wilson Mut. Ins. Co.*, 2019 WI 62, ¶ 23, 387 Wis. 2d 213, 225, 928 N.W.2d 555, 561 (2019) (*quoting Lindas v. Cady*, 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994)). There are three elements: (1) a final judgment on the merits; (2) an identity of the causes of action in the two lawsuits; and (3) an identity between the parties or their privies in the prior and present lawsuits. *Id*. ¶ 25. These three elements are satisfied here.

As for the first element, the circuit court entered a final order resolving Burton's case.

As for the second element, identity of the causes of action, Wisconsin uses the "transactional approach" set forth in the Second Restatement of Judgments. *See Teske*, 2019 WI 62, ¶ 31 (citing Restatement (Second) of Judgments § 24 (1982)). "Pursuant to this analysis, 'all claims arising out of one transaction or factual situation are treated as being part of a single cause of action and they are required to be litigated together.'" *Id*. (*quoting A.B.C.G.*

26

*Enters., Inc. v. First Bank Se., N.A.*, 184 Wis. 2d 465, 481, 515 N.W.2d 904, 910 (1994)). The underlying facts, not the plaintiff's legal arguments, define the scope of a transaction: "the number of substantive theories that may be available to the plaintiff is immaterial—if they all arise from the same factual underpinnings they must all be brought in the same action or be barred from future consideration." *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 555, 525 N.W.2d 723, 729 (1995). Burton's federal case and her state case arise from the same transaction: the revocation of her tenure and her termination.

As for the third element, the parties are identical for purposes of preclusion. In the state court case only the Board of Regents is named as a defendant, whereas in this case Burton names the Board of Regents, the individual regents, and several UWP employees. All the individuals are in privity with the Board of Regents, as the agency responsible for the University of Wisconsin system. *See Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 551, 525 N.W.2d 723, 728 (1995); *Lechnir v. Wells*, 157 F. Supp. 3d 804, 809 (E.D. Wis. 2016).

Burton had a full and fair opportunity to litigate her First Amendment retaliation claims in state court and the elements of preclusion are satisfied. If she is entitled to any relief, she can get it in the Wisconsin Court of Appeals. The state-court decision precludes her litigation of those same claims here.

## 2. The merits

Although the court has concluded that Burton's First Amendment retaliation claims are precluded, the court addresses the merits as well.

The first problem on the merits is that Burton cannot show causation. To prevail on her First Amendment retaliation claim, Burton must show a causal connection between defendants' retaliatory animus and the action against her. *Nieves,* 139 S. Ct. at 1722.

Burton's operative complaint, her fourth amended complaint, Dkt. 51, identified three First Amendment-protected activities as the basis of her retaliation claims. Defendants moved to dismiss some of her claims. Dkt. 56. In granting the motion in part, Dkt. 66, the court identified those three activities as the basis for Burton's First Amendment retaliation claim. *Id.* at 13-15. Burton did not object to the court's characterization of her claims, so the court will consider these three to be the only protected activities on which Burton may proceed under the First Amendment. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (to provide fair notice of a retaliation claim, [t]he protected activity must be specifically identified").

The first activity is an August 2015 letter to then-Governor Scott Walker. Burton asserted that the "very corrupt, liberal administration" at UWP was "mercilessly harassing employees and students" by retaliating against her for assisting a female student in filing a sexual harassment complaint, hacking into her computer, denying her grievance hearings, and complaining about Throop. Dkt. 91-1, at 1. Burton's letter was routed back to Shields's office at UWP, which ultimately forwarded it to the UW System president's office for a response. It's not clear what that response was.

Burton says that she "believes the Walker letter was . . . one of many protected activities that explain why Chancellor Shields took the various actions identified in the lawsuit[,] such as advising Throop to file a police report against Burton, issuing his letter of direction, and the Chapter 4 proceedings." Dkt. 118, ¶ 14. Burton cites evidence that Throop filed a police report after receiving notice of the Walker letter. *See* Dkt. 106-16, at 3. But there's no evidence that Burton faced any consequences as a result of the police report. Indeed, Burton didn't even learn about it until almost two years later. Dkt. 104, ¶ 140. No reasonable jury could conclude that

the police report was the type of action that would deter future First Amendment activity. Burton offers nothing but speculation to support her belief that the Walker letter played any role in Throop's letter of direction or the termination proceedings. Burton has no evidence that retaliation for the Walker letter was the but-for cause of any adverse action against her.

The second activity consists of two complaints that Burton lodged with Crowley in August 2016: one against Shields for "harassment, retaliation, disparate treatment, misuse of funds, and violation of UWS policy," and another against Throop for "retaliation, falsifying information, fabricating allegations, witness tampering, interference with the grievance process, interference with faculty governance, and lying under oath." Dkt. 107-18, at 1. Burton has no evidence that anyone at UWP or the Board of Regents, besides Crowley, knew about these two complaints. And Crowley wasn't among the officials responsible for initiating or deciding the Chapter 4 proceedings against Burton. So Burton cannot show that these two complaints played any role in her termination.

The third activity is a December 9, 2016 email to the Wisconsin attorney general's office asserting that UWP was violating open records laws. *See* Dkt. 109-10, at 1. The email also raised various other grievances related to her first letter of direction and Burke's investigation into the Rice complaint, and she asked the attorney general's office to investigate them. Burton copied Crowley, Shields, and Gormley on the email.

Burton sent this email after Shields issued the letter of direction, so the email played no part in that. And Gormley and Throop began work on the Chapter 4 complaint in November 2016. Burton cites no evidence that the email to the attorney general played any causal role in the Chapter 4 proceedings. *See Healy v. City of Chicago*, 450 F.3d 732, 741 (7th Cir. 2006) ("[A]s a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse

29

employment action does not establish a retaliatory motive." (citation and quotation marks omitted)).

In sum, Burton has not shown that these three activities, assuming they were protected under the First Amendment, played any causal role in her discipline and termination.

In opposing summary judgment, Burton attempts to expand her First Amendment claim beyond the three instances of protected activity identified in her fourth amended complaint. She says that in her view, "every email [she has] been accused of sending [is] protected by . . . the First Amendment." Dkt. 104, ¶ 294. For example, she argues that the email she sent to David Couper excoriating him for referring to himself as a faculty member was protected by the First Amendment because it was "illegal" for him to misrepresent himself, and "[o]pposing illegal acts is a protected activity." Dkt. 101, at 16. It would be grossly unfair to allow Burton to expand her claims beyond those in her complaint in her summary judgment opposition. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (internal quotation marks omitted)).

In any case, Burton's expansive view of her First Amendment rights is legally untenable. As a public employee, Burton's First Amendment rights are circumscribed by the principles in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Under *Garcetti*, a public employee's speech is protected by the First Amendment only when speaking as a private citizen about a matter of public concern. A government employer retains the authority to discipline employees without regard to the First Amendment whenever the employee speaks pursuant to her job duties. In applying *Garcetti* to a First Amendment claim by a faculty member at a public university, the Seventh Circuit said "we have repeatedly held that an employee's speech about misconduct

affecting an area within her responsibility is considered pursuant to her employment even when she is not strictly required to make it." *Hatcher v. Bd. of Trustees of S. Illinois Univ.*, 829 F.3d 531, 539 (7th Cir. 2016), (overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760 (7th Cir. 2016). Burton is in the same position as the professor in *Hatcher*, who also had complained about sexual harassment of a student, and whose complaints were not protected speech.

Burton also invokes the principle of academic freedom, which she says gives her an additional layer of protection in addition to the First Amendment, relying on *McAdams v. Marquette University*, 2018 WI 88, ¶ 62, 383 Wis. 2d 358, 403, 914 N.W.2d 708, 729. In *McAdams*, the Wisconsin Supreme Court held that a private university had wrongfully terminated a professor for speech that was protected by contractually granted academic freedom. The court did not rely on the First Amendment, *id*. 2018 WI 88, ¶ 95 n.35, so *McAdams* is of no help to Burton. To be clear, Burton is entitled to academic freedom under state regulations, which would generally protect the content of her teaching, research, and public commentary. Wis. Admin. Code UWS § 4.01(2).

But the First Amendment does not afford blanket immunity for faculty speech, and it does not prevent the university and the Board of Regents from disciplining or terminating a tenured faculty member who engages in disruptive and uncivil speech. *See Wozniak v. Adesida,* 932 F.3d 1008, 1010 (7th Cir. 2019) (rejecting college professor's First Amendment claim for engaging in harassing speech and speech that was about "personal job-related matters"). There is overwhelming evidence that Burton's conduct made it impossible for UWP to provide a safe, harmonious work environment for the faculty and staff in the criminal justice department. Burton was quick to accuse others of bad faith and she demonstrated an inability to resolve

conflicts professionally. She sent contemptuous and needlessly inflammatory emails to colleagues and supervisors. She garnered multiple hostile-work-environment complaints, and she ignored repeated directives to find more courteous and productive ways to express her concerns. Burton failed to show the level of discretion and professional judgment one would expect of a tenured university professor, as demonstrated by her decision to secretly record confidential faculty reviews and then allow her husband to publish those sensitive materials online. In sum, she created a toxic work environment and she was terminated only after the extensive process afforded to her under state law.

The court will grant summary judgment to defendants on Burton's First Amendment retaliation claim.

**E.  Conclusion**

Burton filed a motion to compel discovery shortly after defendants moved for summary judgment. Dkt. 98. The court stayed briefing and a decision on that motion pending the outcome on defendants' summary judgment motion. Dkt. 99, at 2–4. Because I am granting summary judgment to defendants on Burton's remaining claims, I will deny her motion to compel as moot.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 90, is GRANTED.

2.  Plaintiff Sabina Burton's motion to compel, Dkt. 98, is DENIED as moot.

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered September 4, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge